**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| April Netus, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:04-cv-841 |
| | ) | |
| University of Cincinnati, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This matter is before the Court on Defendants' motion for summary judgment on all claims. (Doc. 23). Plaintiff opposes summary judgment only on her claim of retaliation under federal law against Defendant the University of Cincinnati (hereinafter, "U.C."). For the reasons that follow, Defendants' motion for summary judgment is **GRANTED.**

I.  Introduction

Plaintiff April Netus brings this action against Defendants U.C. and Francisco J. Gomez and Simon L. Newman, both employees of U.C. Plaintiff claims that while she was employed as a Research Assistant with U.C., Dr. Newman treated her differently from male employees and he and Dr. Gomez harassed her because of her sex. Plaintiff claims she complained to numerous administrators at U.C. and requested an investigation

1

into Dr. Gomez's actions and into Dr. Newman's disparate treatment of women.  Plaintiff claims she received unwarranted disciplinary action from Dr. Newman and others after filing a formal complaint against Dr. Newman alleging he had created a hostile work environment based upon Plaintiff's sex and in retaliation for Plaintiff's complaints of assault and sexual harassment against Dr. Gomez.  Plaintiff further claims that Dr. Gomez retaliated against her after she filed charges against him in Hamilton County, Ohio.  Finally, Plaintiff claims that U.C. discriminated against her and created a hostile environment based on her sex and retaliated against her by terminating her employment.

## II.  Background

Defendant Simon Newman holds a Ph.D. and is a researcher and a tenured professor in U.C.'s Department of Internal Medicine, Division of Infectious Diseases. (Newman Decl., ¶ 1).  In addition to his teaching responsibilities, Dr. Newman conducts grant-funded research in the study of histoplasma capsulatum, a fungus that can be fatal to humans with immune system deficiencies.  (Id. at ¶ 2).  Dr. Newman has supervised a research laboratory in U.C.'s Medical Sciences Building since 1987.  (Id. at ¶ 1). Defendant Francisco Gomez is a physician and an assistant professor of medicine in the Division of Infectious Diseases.  (Gomez Decl. ¶ 1).  He conducts grant-funded research and operates his own lab in the Veterans Administration Hospital.  (Id. at ¶ 2).

Plaintiff began her employment with U.C. in 2001 as a Research Assistant. (Plaintiff's depo., p. 51).  After a brief break in her employment, she was re-hired in September 2002 as a Research Assistant in Dr. Newman's lab.  (Id., p. 65).  Plaintiff's duties included setting up experiments for Dr. Newman's research, preparing tissue cultures, stocking solutions, performing radiation safety checks, making reagents, stocking lab supplies, and performing other general lab administration and maintenance duties.  (Id., pp. 67-69).  Typically, Dr. Newman outlined Plaintiff's duties for her on a day-to-day basis.  (Id., p. 73).

On March 28, 2003, Plaintiff and a co-worker, Emily Powell, encountered Dr. Gomez and his research assistant at a restaurant during lunch.  (Id., pp. 147-48).  Dr. Gomez sent drinks to Plaintiff and Ms. Powell.  (Id., p. 148).  Plaintiff took one sip of her drink and then offered it to Dr. Gomez when she got up to leave the restaurant.  (Id., pp. 148-49).  Dr. Gomez, who apparently was intoxicated, stood up, grabbed Plaintiff's hair and, according to Plaintiff, held the drink up over her head and began to shake her head. (Id., pp. 149-50).  Dr. Gomez laughed and said, "I now baptize you in the name of the Father, the Son, and the Holy Ghost."  (Id., p. 150).  Plaintiff and Ms. Powell immediately left the restaurant and Plaintiff reported the incident to Dr. Newman and to Heather Kaminsky, U.C.'s Business Administrator with the Department of Internal Medicine. (Id., pp. 151, 156, 163).  Dr. Newman advised Plaintiff to go home and said that he would meet with Dr. Gomez and discuss the incident with him.  (Id., pp. 161-62).  Dr. Newman agreed that what Dr. Gomez had done was wrong. (Id., p. 169).  Plaintiff also spoke to Dr.

3

George Deepe, Director of the Division of Internal Medicine, Division of Infectious Diseases, about the incident shortly thereafter.  (Id., p. 165).  Dr. Gomez subsequently apologized to Plaintiff at Dr. Deepe's request.  (Id., p. 167).

Plaintiff received her first and only performance evaluation in June of 2003.  (Id., exh. 2).  Dr. Newman completed the evaluation, which was for the period from September 17, 2002 to June 30, 2003.  Plaintiff was rated "consistently meets and often exceeds performance standards" in 20 categories; "consistently meets performance standards" in 14 categories; and "does not consistently meet performance standards; often requires guidance or direction" in 5 categories.  The evaluation included the following comments:

> For the most part April has performed well.  She still has some trouble with some of the calculations, and understanding some of the experiments we are doing.  However, she has continued to improve on a daily basis and has a good handle on the techniques she has learned.  I am happy with her current progress.

Several months later, on October 2, 2003, Plaintiff's attorney sent a letter on her behalf to Linda L. Price, Assistant Dean for Faculty and Administrative Affairs at U.C.'s College of Medicine.  (Id., exh. 4).  In the letter, counsel informed Ms. Price that it was his understanding that Plaintiff had spoken with Ms. Price "about the continued harassment" by Dr. Newman and that Plaintiff had informed counsel that Dr. Newman "has a history of treating women different from male employees that he supervises."  Counsel asked Ms. Price to investigate Plaintiff's claims of a hostile environment and her claims "that she is being treated differently and yelled at on a continuing basis."

4

Plaintiff met with individuals at U.C.'s Office of Equal Opportunity (hereinafter, "OEO") with regard to her complaint on October 29, 2003. Plaintiff told the OEO representatives that Dr. Newman screamed and cursed at her but not at Jeremy Hilty, a male graduate student who was doing his thesis research in Dr. Newman's lab. (Id., p. 253). Following the meeting, on November 24, 2003, OEO Assistant Director Kecia Pringle requested a summary of Plaintiff's complaint in writing, including documentation as to what had taken place. (Id., exh. 5). Ms. Pringle invited Plaintiff to contact her for any assistance. (Id.) Plaintiff sent an e-mail in response, asking if she could have the summary to Ms. Pringle by the second week in December. (Id., exh. 6). Plaintiff does not recall if she provided anything in writing to Ms. Pringle within that time frame. (Id., p. 263).

On January 28, 2004, Plaintiff, who had been working in one area of the lab that was separated from the computer office area by a partition, walked across the hallway into the computer office area and saw Dr. Gomez and Mr. Hilty sitting together looking at the computer. (Id., pp. 273, 276). It appeared to Plaintiff that Dr. Gomez was helping Mr. Hilty with something. (Id., p. 276). According to Dr. Gomez, Mr. Hilty had contacted him some time in January about a problem Mr. Hilty was having in Dr. Gomez's area of expertise, molecular biology. (Gomez decl., ¶ 4). Dr. Gomez was early for a meeting at U.C.'s Medical Sciences Building on the 28th, so he stopped into Dr. Newman's lab to discuss Mr. Hilty's research difficulties with him in person and to look at the data on his computer. (Id., ¶ 5). While they were discussing the problem, Dr.

5

Newman entered the lab and joined them.  (Id., ¶ 6).  When Plaintiff saw Dr. Gomez, she

asked Dr. Newman to ask him to leave.  (Plaintiff's depo., pp. 274, 276-77).  Dr. Newman

told Plaintiff to not worry, Dr. Gomez was not going to hurt her, he had said he was sorry,

and there was no reason to be afraid.  (Id., p. 274).  Dr. Gomez did not say anything to

Plaintiff.  (Id., p. 276).  Plaintiff became angry and loudly said something to the effect of

"Get the mother fucker away from me," and "How do you know he's not drunk now?" or

"When is an alcoholic safe?"  (Id., pp. 274-75, 277).  Plaintiff then returned to the other

side of the lab and finished her work.  (Id., p. 278).  Plaintiff did not know why Dr.

Gomez was in the computer office and who had invited him into the office.  (Id., p. 280).

Plaintiff did not go to anyone at U.C. to talk about the incident, but she did go to

the Cincinnati police that day after she left work.  (Id., pp. 280-81).  The police officer

with whom she spoke advised her that if Dr. Gomez was making her uncomfortable and if

this had happened in the past, then she needed to file for a restraining order, which

Plaintiff did.  (Id., p. 283).  There was a hearing on the order at which Plaintiff, Ms.

Powell, and Dr. Gomez testified.  (Id., pp. 283-284).  At the hearing, Ms. Powell

described the incident that had occurred at the restaurant in March 2003.  (Id., p. 284).

The judge granted the restraining order for a period of 30 to 60 days and continued the

matter until the end of that time period.  (Id., pp. 283-84).  Plaintiff did not attend the

second hearing because she had been terminated by that time.  (Id., p. 284).

The day after the lab incident, Plaintiff filed her first formal complaint with the

OEO.  (Id., exh. 1).  In the complaint, Plaintiff requested that the OEO investigate charges

of assault and sexual harassment against Dr. Gomez stemming from the restaurant incident.  Plaintiff stated that she had immediately reported the incident to Ms. Kaminsky and to Dr. Newman.  She asserted that she had also met with Dr. Deepe on March 31, 2003, and had informed him that she wanted some type of disciplinary action taken against Dr. Gomez, to which Dr. Deepe had responded that he would talk to Dr. Gomez.  Plaintiff noted in her complaint that Dr. Gomez had apologized to her on April 1, 2003, but she had not accepted his apology.  Plaintiff also made the following statement in her complaint:

> Mycology seminar is every Friday at 16:00.  While in seminar, of the 20 or so seats to choose from, Mr. Gomez decides to sit right across from me, and he is staring at me the whole time in this lustful, leering stare, occasionally glancing away, and then staring again.  He seems to try and find reasons, and/or ways to be near me.

Plaintiff also recounted in her complaint the incident from the preceding day:

> Mr. Gomez is in the lab without my knowledge, sitting quietly at the computer with Jeremy Hilty, graduate student, Darryl, graduate student, and with Dr. Newman.  When I saw this I asked Dr. Newman to ask him to leave, to which he replied no because they needed to use the computer to work on a paper, and that I had no reason to be afraid because he wouldn't assault me again.  I explained to Dr. Newman that this situation made me feel uncomfortable, and I was afraid to be in the same room with him.  Please keep in mind that no disciplinary actions have yet been taken, but apparently it was over for everyone else.  Dr. Newman asked me what more did I want because he had already said that he was sorry.  I told him fine, then I would leave.  I refuse to work in a hostile work environment.  I left the lab and finished out the day by completing my work.

Plaintiff then stated that she believed Dr. Gomez, "the Assailant," posed "an immediate and present danger" to her.  She stated that she had every reason to believe he would continue to cause physical harm or mental distress by sitting directly outside of the lab in which Plaintiff worked and talking and going out of his way for her to see him when in fact the department was big enough that she "should never have to see him if he did not want [her] to."  Plaintiff concluded by stating she did not feel safe at work and she had called work to let Dr. Newman know she would not be returning to work until Dr. Gomez had received the restraining order her attorney had advised her to file.

On January 30, 2004, Plaintiff sent an e-mail to Dr. Newman informing him that she would not be reporting to work that day "due to near and present danger" posed by Dr. Gomez.  (Id., exh. 7).  In the e-mail, she quoted  Ohio's "menacing by stalking" statute.  Dr. Newman responded to Plaintiff by e-mail that same day and informed her that she would be charged vacation for the time she was missing, stating that there was no

reason to believe there was any danger posed by Dr. Gomez, and informing Plaintiff that

if she had any specific facts to share as opposed to vague accusations showing that Dr.

Gomez did pose a danger, he expected Plaintiff to share that information with him

immediately via return e-mail.  (Id.)  Dr. Newman also advised Plaintiff they would have

to discuss her behavior in the lab when she returned to work since her behavior, "which

included cursing loudly about Dr. Gomez, and being disorderly for no apparent reason

was totally disruptive to our work, and upsetting to other staff members."

Plaintiff filed her second OEO complaint on February 2, 2004.  (Id., exh. 8).  She

stated that for as long as she could remember, Dr. Newman had yelled and cursed in the

lab, although with time the yelling and cursing had become more frequent.  Plaintiff

stated that she was the only one Dr. Newman had ever yelled at and that Mr. Hilty was

never yelled at.  Plaintiff stated that she was curious as to the difference in treatment since

she is an African American female and Mr. Hilty is a white male.  Plaintiff complained

that she had been given poor laboratory instruction; she criticized Dr. Newman's

leadership and laboratory techniques; she suggested that Dr. Newman was to blame for

some of the contamination problems he blamed on her; and she stated that she had "great

aseptic technique" as demonstrated by her performance at her former job.  Plaintiff then

went on to list eight "isolated" instances of contamination that had occurred on specific

dates in 2003 and which had allegedly resulted in "hostile work environment, i.e.,

screaming, yelling, and cursing."  Plaintiff once again described the incident where she

had come across Dr. Gomez in the lab and added,

> I left the lab very angry, it was very obvious to me that this was a retaliatory act on Dr. Newman's part as I had previously verbally complained to Human Resources within the Division of College of Medicine, and Office of Equal Opportunity. It is my feeling that he deliberately staged this whole event in an effort to create mental distress, anguish, and a continuing hostile environment for me, April Netus.

Plaintiff concluded by noting that she would return to work upon verification that the Order for Protection that was officially filed on that date had been served and by noting that Dr. Newman had informed her that he would be taking disciplinary action regarding the January 28th incident upon her return to work. In response, Ms. Pringle requested that Plaintiff call her so they could discuss the complaint and proceed. (Id., exh. 11).

Plaintiff filed a third OEO complaint on February 9, 2004, and requested that the OEO formally investigate charges of retaliation filed against Dr. Newman. (Id., exhs. 9, 10). Plaintiff claimed that on February 4, 2004, she had received disciplinary action that she regarded as retaliation from Dr. Newman and Kathy Qualls, Director of Business Operations and Chief Financial Officer for the Division of Infectious Diseases, for her outburst in the lab concerning Dr. Gomez. Plaintiff also claimed that she regarded Dr. Newman's complaints regarding the following incidents as retaliation: leaving L-Glutamine and PenStrep in the water bath, which then had to be thrown out; not "helping the graduate students based on accurate information;" and taking the lab notebook home instead of leaving it in the lab. Plaintiff then reiterated the eight incidents of contamination enumerated in her earlier complaint that she claimed had resulted in a hostile work environment. Plaintiff went on to list six "isolated events resulting in

retaliation." These were: (1) Dr. Gomez being within 500 yards of her on January 28, 2004, purportedly at Dr. Newman's invitation, after she had allegedly filed assault charges against him with the Cincinnati police; (2) the January 29, 2004 OEO complaint filed against Dr. Gomez regarding the assault and sexual harassment charges; (3) the January 30, 2004 Order of Protection filed with the Hamilton County Sheriff's Office against Dr. Gomez; (4) the February 2, 2004 OEO complaint against Dr. Newman regarding charges of hostile work environment and sex discrimination/harassment; (5) the February 4, 2004 disciplinary action taken against Plaintiff for the outburst in the lab "as a result of the hostile work environment Dr. Newman created by inviting Dr. Gomez into the lab, also retaliation, as he was fully aware of the assault charges that were formally filed, and had been contacted by my lawyer in October;" and (6) the February 9, 2004 OEO complaint filed as a result of retaliation in the workplace (the complaint she was currently filing).

Plaintiff also completed an EEOC questionnaire on February 9, 2004. (Id., exh. 13). Plaintiff complained that U.C. had done nothing to investigate her claim, as a result of which Dr. Gomez continued to sexually harass her, and she was retaliated against on January 28 and February 4, 2004.

The OEO advised Plaintiff that as of February 9, 2004, it had received all of the information it needed from Plaintiff to begin its investigation. (Id., exh. 12). The OEO interpreted Plaintiff's complaint to include assault and sexual harassment by Dr. Gomez occurring on March 23, 2003, and retaliation by Dr. Newman based on the January 28th

lab incident.  The letter advised Plaintiff that the issues would be investigated

immediately and all findings communicated as expeditiously as possible.

Plaintiff filed a charge with the Equal Employment Opportunity Commission

(EEOC) on March 5, 2004.  (Id., exh. 15).  Plaintiff alleged she had been sexually

harassed and retaliated against for complaining about sexual harassment.

The OEO issued its determination on Plaintiff's complaint filed with that office on

March 23, 2004.  (Id., exh. 14).  The OEO concluded that the incident at the restaurant

did not constitute sexual harassment and there was no evidence that any other incidents of

sexual harassment had occurred.  The OEO stated,

> The allegation that Dr. Gomez assaulted you is a matter for police
> investigation and was not addressed in this investigation.  Our investigation
> reviewed the incident that occurred on March 28, 2003 in which you allege
> Dr. Gomez grabbed your hair while at a restaurant.  While there is
> conflicting information as to exactly what took place, we concluded Dr.
> Gomez acted inappropriately in approaching you.  This was confirmed in a
> memo to Dr. Gomez, dated April 1, 2003 from George S. Deepe, M.D., and
> is accepted as addressing the situation.

The OEO also stated that it found no evidence that Dr. Newman had retaliated against

Plaintiff by reprimanding her for inappropriate behavior in the lab on January 28, 2004,

since the reprimand was appropriate.  Finally, the OEO found that Plaintiff had presented

insufficient information and had provided no witnesses to confirm her allegation of a

hostile work environment.

Plaintiff had a meeting with Dr. Deepe, who was Dr. Newman's direct supervisor,

on April 7, 2004.  (Id., p. 299).  The meeting was prompted by Plaintiff's belief that Dr.

Newman had "given [her] incorrect lab instructions again."  (Id.)  Plaintiff showed Dr.

Deepe a notebook where Dr. Newman had "deliberately" given her the wrong

concentration to use in the cells.  (Id., p. 300).   She told Dr. Deepe something to the

effect that she was "sick of the yelling, the screaming.  And now he's sabotaging my

work." (Id.).  Dr. Deepe told Plaintiff he would meet with Dr. Newman.  (Id.)

Dr. Newman met with Plaintiff the following day.  (Id., p. 351).  Ms. Qualls and

Ms. Kaminsky were also present at the meeting.  (Id., p. 354).  Plaintiff gave varying

accounts of the meeting at her deposition.  She initially testified that Dr. Newman called

her into the meeting and told her that he was not satisfied with her work performance; she

was the reason he was not receiving any grants or funding; they had discussed these

issues before; Plaintiff responded that the reason they were really there was because she

was being retaliated against for filing a complaint with the OEO and the EEOC; and at

that point, Ms. Qualls, who was also present at the meeting, cut the meeting off and told

Plaintiff the reason she was there was because she was fired.  (Id., pp. 351-53).  Plaintiff

later testified that Dr. Newman told her at the beginning of the meeting before any

discussion that her employment was being terminated and handed her a memorandum that

set forth a number of performance issues and errors that had occurred on dates between

July 26, 2003 and April 6, 2004.  (Id., pp. 372-73; exh. 3). Dr. Newman testified at his

deposition that Plaintiff would not accept responsibility and had a bad attitude at the

meeting; it was clear nothing was going to change; he therefore decided to terminate her

as a result of the meeting; and if she had acted differently at the meeting, he would not

have terminated her. (Newman depo., pp. 44-45). Ms. Qualls testified at her deposition that the purpose of the meeting was to discuss performance problems. (Qualls depo., p. 26). She stated the initial hope was they would make some progress and be able to reach a resolution but if they could not, Plaintiff would be dismissed. (Id., pp. 26-27). Ms. Qualls testified that Dr. Newman made the decision to terminate Plaintiff during the meeting because they were unable to make progress toward the end goal of improving performance and resolving the problems. (Id., p. 43).

The parties do not dispute that at the termination meeting, Dr. Newman gave Plaintiff the memorandum attached as exhibit 3 to her deposition. The performance issues and errors documented in the memorandum include failure to set up controls properly for an experiment, resulting in the experiment being ruined; numerous instances of contamination; repeated errors resulting from "sloppy laboratory technique;" writing down incorrect information; straying from and modifying established lab procedures despite Dr. Newman's explicit instructions to the contrary; committing errors when performing simple calculations; failing to follow written and oral instructions; using abusive language and acting in an unprofessional manner upon encountering Dr. Gomez in the lab; and reacting in an argumentative manner during the February 4, 2004 meeting to address the January 28th lab incident. Dr. Newman stated in the memorandum that these occurrences had caused a loss of time and expensive reagents and had hindered his research progress and his ability to continue to obtain grant funding. He further stated that since her original hire date, Plaintiff had been unable to produce sufficient data from

14

her experiments to aid him in his research effort and to submit publications based on the findings.

By letter dated April 8, 2004, Dr. Newman advised Plaintiff that he was terminating her employment.  (Plaintiff's depo., exh. 18).  In the letter, Dr. Newman referenced the meeting held that day "to discuss serious performance issues."  Dr. Newman stated that he had presented Plaintiff with a list of errors that had occurred over the past 18 months, including the most recent incidents of the past two weeks.  Dr. Newman indicated that he and Plaintiff had talked about each of these mistakes previously when they had originally occurred.  He stated that the errors suggested that Plaintiff was not focused on her work and that, in some cases, she did not understand what she was doing.  Dr. Newman further asserted that on several occasions, Plaintiff had

changed his protocols without informing him.  Dr. Newman stated:

> These mistakes have had a profound negative impact on the progress of my
> grant.  In the past year and a half, you have not generated sufficient data for
> even one publication.  This lack of productivity puts into jeopardy my
> ability to continue to secure grant funding for this project.
> * * * *
> Rather than attempt to address these issues in a constructive manner, you
> denied that there were problems, stated that you were "overqualified for this
> position," would not accept responsibility for your mistakes, and essentially
> accused me of trying to trump up charges to get rid of you.  Your poor
> attitude, and denial that there are real performance problems, effectively
> eliminates any hope that you might improve your performance.

Plaintiff received her Notice of Right to Sue from the EEOC on September 24,

2004  (Id., exh. 19).  She filed this lawsuit on December 21, 2004.

### III.  Summary judgment standard

Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  The evidence presented on a motion

for summary judgment is construed in the light most favorable to the non-moving party,

who is given the benefit of all favorable inferences that can be drawn therefrom.  United

States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  "[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no genuine issue of material fact."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986) (emphasis in original).

The court will not grant summary judgment unless it is clear that a trial is unnecessary.

The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

## IV.  Applicable law

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected under Title VII; (2) the exercise of protected rights was known to defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse employment action. Ford v. Gen. Motors Co., 305 F.3d 545, 552-53 (6th Cir. 2002) (citations omitted).  "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met."  Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

In order to establish an "adverse employment action" so as to satisfy the second

17

prong of a prima facie case, the plaintiff must show "a materially adverse change in the terms and conditions of [her] employment." Hollins v. Atlantic Company, 188 F.3d 652, 662 (6th Cir. 1999).  A change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996) (quoting Crady v. Liberty Nat'l Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)).  A materially adverse change might be indicated by a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id.

To establish a causal connection, plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in protected activity. Nguyen, 229 F.3d at 563.  Evidence that the defendant treated the plaintiff differently from similarly-situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. Id. (citing Moon v. Transport Drivers, Inc., 836 F.2d 226, 230 (6th Cir. 1987)).

The Sixth Circuit has indicated that there are certain cases where temporal proximity alone may give rise to an inference of retaliation.  See, e.g., Nguyen, 229 F.3d at 567 ("while there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an inference of a causal link], we do not hesitate to say that they have

18

not been presented in this case"); Ford, 305 F.3d at 554-55 (quoting Moon, 836 F.2d at 229) ("Although 'temporal proximity alone will not support an inference in the face of compelling evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection;'" DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004) ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.")  The Court suggested in a recent decision, however, that temporal proximity is never sufficient, standing alone, to permit an inference of a causal connection.  See Randolph v. Ohio Dep't of Youth Services, No. 04-3468, 06a0243p.06 (6th Cir. July 13, 2006) (slip op.) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection.")

Once the plaintiff establishes a prima facie case of retaliation, the burden is on the defendant to establish a legitimate reason for the adverse action, which plaintiff may rebut by producing credible evidence of pretext.  Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., 783 F.2d 50, 54 (6th Cir. 1986).  The Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the adverse employment decision; or 3) the reasons were insufficient to warrant the decision made.  Manzer v. Diamond Shamrock Chemicals Co.,

19

29 F.3d 1078, 1084 (6th Cir. 1994).  The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, that is, the reason is factually false.  Id.  The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge.  Id.  If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises. Id. For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, plaintiff must introduce additional evidence of discrimination because the reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination. Id.

Although the court should refrain from probing an employer's business judgment, business judgment is not an absolute defense to unlawful discrimination.  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003).  "[T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."  Id. (citing Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)).  The plaintiff may establish pretext by showing that the "asserted business judgment was so ridden with error that Defendant could not honestly have relied upon it."  Id. (quoting In re Lewis, 845 F.2d 624, 633 (6th Cir. 1988)).

V.  Opinion

20

A. <u>Prima facie case</u>

It is undisputed that Plaintiff can establish the first three elements of a prima facie case of retaliation: (1) she engaged in activity protected under Title VII; (2) Defendant knew of her protected activity; and (3) Defendant thereafter took an adverse employment action by terminating Plaintiff's employment. The parties disagree as to whether Plaintiff has come forward with sufficient evidence to establish a causal connection between her protected activity and her termination so as to satisfy the fourth prong of her prima facie case.

Plaintiff claims that the timing in this case is sufficient to demonstrate a causal connection between her protected activity and her termination. Plaintiff contends that a jury could reasonably infer that Dr. Newman engaged in a "campaign of unjustified discipline" after her attorney contacted U.C. in October 2003 to request that her claims of harassment and discrimination be investigated, which was only three months after she had received what she describes as a "positive performance review." As an example of unjustified discipline, Plaintiff cites the reprimand she received from Dr. Newman for using profane language upon encountering Dr. Gomez in the lab on January 28, 2004. Plaintiff argues that Dr. Newman had himself used profane language and had made angry statements in the lab "and thus can hardly take her to task for such supposed misconduct." Plaintiff characterizes her objection to Dr. Gomez's presence in the lab as an aberration since Dr. Newman had stated in her June review that she was "pleasant to work with, happy to assist others, and got along well with others." Plaintiff further alleges that to discipline her "for

objecting to the presence of a man who had assaulted her can easily be challenged."

Plaintiff further notes that within one month of the close of U.C.'s investigation into her complaints and the filing of her EEOC charge, U.C. terminated her employment. She claims that her meeting with Dr. Deepe the day before her termination further bolsters an inference of discriminatory intent because in that meeting, she challenged Dr. Newman's good faith and claimed he was trying to sabotage her performance.

Finally, Plaintiff argues that a jury could reasonably infer a causal connection from the fact that Dr. Newman never even attempted to issue any written discipline until the letter of April 8, 2004, in which he chronicled alleged performance deficiencies which had occurred over the preceding months. Plaintiff claims that a jury could conclude that U.C. "papered her file" to support her termination, an inference that Plaintiff claims is further supported by Dr. Newman's testimony that he threw away the handwritten notes that he had allegedly made contemporaneously with the events described in the letter.

Defendants argue that Plaintiff cannot establish a causal connection between her protected activity and her termination because she admits that problems with her performance were addressed both before and after she complained about harassment and unfair treatment.

Initially, the Court finds that the reprimand Plaintiff received for her outburst upon encountering Dr. Gomez in the lab is not probative of a causal connection between her complaints of harassment and discrimination and her subsequent termination.  Evidence that Dr. Newman may have uttered profanities and made angry statements in the lab is not relevant because he was Plaintiff's supervisor and was not similarly-situated to her in any material respect.  Moreover, Plaintiff's behavior was extremely unprofessional and went well beyond the mere use of profane language or the uttering of an angry statement. Defendant's decision to reprimand Plaintiff for her inappropriate behavior was a business judgment that was not so unreasonable that Defendant could not honestly have relied upon it.

Similarly, under the circumstances of this case, Defendant's failure to issue written discipline prior to Plaintiff's termination is not evidence of a causal connection between Plaintiff's complaints and her subsequent termination.  As discussed in more detail in the pretext discussion that follows, it is clear from the record that although Plaintiff does not recall Dr. Newman addressing certain performance issues or incidents at the time they occurred (see Plaintiff's depo., pp. 357-358), she does not dispute that Dr. Newman did discuss a number of specific incidents and problems with her throughout the course of her

employment.  The record also discloses that Dr. Newman addressed problems and areas of concern in Plaintiff's June 2003 evaluation, he occasionally left notes for her regarding specific errors, and he and Ms. Qualls met with Plaintiff on February 4, 2004, regarding the January 28th lab incident.  Furthermore, Plaintiff acknowledged at her deposition that Dr. Newman worked with her on some of the problem areas.  In view of the efforts Defendants undertook to address issues concerning Plaintiff's performance over the course of her employment, U.C.'s failure to take additional, formal disciplinary steps prior to her termination does not support an inference of a retaliatory intent.

This leaves only the temporal proximity between the filing of Plaintiff's EEOC charge and her termination as evidence on which Plaintiff can reasonably rely to establish a causal connection.  The time period between the filing of the charge and Plaintiff's termination was very short - approximately one month.  Some decisions handed down by the Sixth Circuit support a finding that such a brief time period is sufficient, standing alone, to satisfy the causal connection element of a prima facie case of retaliation.  Accordingly, drawing all inferences in Plaintiff's favor, the Court finds that Plaintiff has come forward with sufficient evidence to permit an inference of a causal connection between her protected activity and her termination and to allow her to proceed beyond the prima facie stage.

B.  Pretext

Defendant has offered a legitimate, non-retaliatory reason for Plaintiff's discharge. Defendant claims it terminated Plaintiff's employment because her substandard performance substantially impaired Dr. Newman's ability to publish his research and jeopardized his grant funding.  Defendant alleges that Plaintiff admits she had problems with contamination, she had difficulty understanding and applying the required calculations, and she made changes to lab procedures without Dr. Newman's input. Defendant also alleges that Dr. Newman continued to communicate the performance deficiencies as they occurred.

Plaintiff claims that Defendant's reason for her termination is pretextual.  She contends she has presented evidence that others in the lab may have been responsible for many of the contamination issues for which she was blamed; she requested training and equipment to aid in alleviating the contamination occurring in the lab; she requested formal protocols for her work in the lab but was refused and was instead criticized for not following the protocols; she tried to comply with Dr. Newman's instructions to take tests and perform drills to improve her calculation skills and suggested methods to increase the efficiency of calculations by creating reference sheets, but Dr. Newman rejected this suggestion; Dr. Newman gave her incorrect lab instructions more than once and then tried to criticize her for ensuing problems; and Dr. Newman failed to discipline Plaintiff for her numerous alleged performance deficiencies until after she had filed a charge with the EEOC, and he did not make her performance problems that had begun occurring eight

25

months earlier the subject of a written notice.

Plaintiff has not come forward with sufficient evidence of pretext. Plaintiff objects in large part to Dr. Newman's research methods and the way he supervised her work, and she sometimes goes so far as to criticize him for refusing to do things her way. It is not the province of the Court or the trier-of-fact, however, to second-guess Defendant's decisions as to how to conduct its business operations. Dr. Newman's alleged deficiencies as a researcher and supervisor and his failure to fault himself for problems in the lab he oversaw are not competent evidence of pretext.

Moreover, Dr. Newman's failure to formally discipline Plaintiff for her performance deficiencies until after she had filed an EEOC charge does not support a finding of pretext under the circumstances of this case. First, there is no dispute that Defendant had addressed performance issues with Plaintiff throughout her employment, both before and after she filed her EEOC charge. Plaintiff acknowledges that calculations were an important part of her job, Dr. Newman told her in her June 2003 evaluation that she needed to improve in the area of calculations, and he gave her tests or drills that he and Plaintiff went through together in order to help her improve. (Plaintiff's depo., pp. 188-89). Plaintiff also acknowledges that Dr. Newman discussed contamination issues with her at that time and the importance of independent thinking as a researcher. (Id., pp. 182-83). Plaintiff testified at her deposition concerning other problems Dr. Newman had discussed with her at the time they occurred, including problems performing calculations when she first started, a ruined experiment on October 1, 2003, an incident on October 15, 2003,

when Plaintiff called from home to tell Dr. Newman she had forgotten to pulse an experiment, a problem with lymphocytes in the culture on February 5, 2004, and contamination problems.  (Id., pp. 355-60, 364).  Dr. Newman testified at his deposition that he had a discussion with Plaintiff in September 2003, prior to the date her attorney had sent the letter complaining of mistreatment by Dr. Newman, regarding a number of performance issues, including contamination, calculation errors, failure to put controls in experiments, failure to put away valuable reagents, and changing the protocols without telling him.  (Newman depo., pp. 38-39).[1]  Plaintiff recalls Dr. Newman talking to her about a number of specific incidents that occurred around that same time, including a culture contamination that spanned a two-week period from July to August 2003 when Dr. Newman was on vacation; a lysotracker marking error in August 2003; and incidents where Plaintiff changed the spin time on the centrifuge, strayed from established lab procedures in setting the media temperature, made an alleged miscalculation, and was blamed for a mishap involving fetal calf serum, all of which occurred in September 2003.  (Plaintiff's depo., pp. 229-40).  Plaintiff also recalls receiving a note from Dr. Newman dated February 15, 2004, concerning some substances that had been left out and ruined, although she denied responsibility for the mistake, as well as a note dated that same date regarding failure to get lymphocytes washed off.  (Id., pp. 347-48, 350; exhs. 16, 17).

In addition to the fact that Defendants had addressed Plaintiff's performance issues

_____

[1] Plaintiff testified at her deposition that she did not recall such a meeting.  (Plaintiff's depo., p. 242).

with her during her employment, there is no evidence that U.C. had a procedure for

providing a written warning or discipline prior to termination which it failed to follow in

Plaintiff's case.  Plaintiff nonetheless contends that U.C.'s policies encourage such a step.

In support of her position, Plaintiff quotes a U.C. policy provision that states as follows:

> Except in the case of an offense justifying the immediate removal of an
> employee, the [U]niversity of Cincinnati promotes the philosophy of
> progressive discipline which provides the employee the opportunity to
> understand the problem and the corrective action necessary to improve
> identified deficiencies.

(See Plaintiff's opposing memorandum, exh. 1).  Nothing in the cited provision encourages

the issuance of a written warning or notice, however, and Dr. Newman 's efforts to review

Plaintiff's mistakes with her and offer her suggestions for improving did not violate the

policy in any respect.  U.C.'s failure to issue a written warning or to discipline Plaintiff

prior to her termination is not evidence of pretext.

## VI.  <u>Conclusion</u>

The record does not support a reasonable inference that Defendant retaliated against Plaintiff because of her complaints of harassment and discrimination.  Accordingly, Defendants' motion for summary judgment is well-taken and is **GRANTED**.  Plaintiff's claims are **DISMISSED WITH PREJUDICE.  THIS CASE IS CLOSED.**

**IT IS SO ORDERED.**


Date: <u>7/26/06</u>                                      <u>S/ Sandra S. Beckwith         </u>
                                                        Sandra S. Beckwith, Chief Judge
                                                           United States District Court

29